IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| ACKERMAN MCQUEEN, INC., MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,<br>　　*Movants*,<br><br>v.<br><br>NATIONAL RIFLE ASSOCIATION OF AMERICA and WAYNE LAPIERRE,<br>　　*Respondents*. | § § § § § § § § § § § § § § | Miscellaneous Case No. 1:20-mc-00006<br><br>Related Civ. Action No. 3:19-cv-02074-G (Northern District of Texas) |

## REPLY IN SUPPORT OF MOTION TO QUASH THIRD PARTY SUBPOENA

Movants agree with the NRA and believe that exceptional circumstances justify the transfer of the Motion to Quash to the Northern District of Texas. Indeed, the Western District of Oklahoma recently transferred a similar Motion to Quash after determining exceptional circumstances are present based upon the Northern District of Texas' familiarity with the underlying case, which court is presently considering a motion to dismiss and two motions to compel.[1] The NRA stated in its opposition brief that the Motion should be transferred.[2]

In the event that this motion is not transferred to the Northern District of Texas, Movants address the NRA's Opposition to the Motion to Quash. To quash a third party subpoena, one must have a "personal right or privilege" in the requested documents.[3] "[T]he party need only have *some* personal right or privilege in the information sought to have standing to challenge a subpoena

---

[1] *See* February 26, 2020 Order in *Ackerman McQueen, Inc., et al. v. National Rifle Association of America, et al.*, Case No. MC-20-0001-HE (W.D. Okla.). [Attached as Exhibit A.]
[2] ECF 3 at 11-12 (section C, entitled "Transfer To The Northern District Of Texas Is The Proper Course of Action").
[3] *In re ThompsonMcMullan, P.C.*, No. 3:16-MC-1, 2016 U.S. Dist. LEXIS 35172, at *11-12 (E.D. Va. Mar. 17, 2016) ("To the extent that [the movant] claims that the request includes confidential and privileged information, [the movant] unquestionably claims the sort of personal right or privilege contemplated by Rule 45.").

to a third party, even if the claimed interest is minimal or exceedingly small."[4] For example, a personal right includes information about one's own business, including "non-public information," such as direct communications between that party and others.[5] Such personal right confers standing to quash a subpoena "on the grounds that [it] require[s] disclosing potentially privileged or otherwise protected matter."[6] The American Clean Skies Foundation ("*ACSF*") subpoena itself demonstrates that personal right when it requests documents that AMc created—not just about AMc's services to ACSF, but how AMc calculated its fair market value billing and "non-public" information like direct communications between AMc and ACSF, for instance. Even the NRA argues that the documents will uncover AMc's alleged knowledge and prior business practices—*i.e.*, information it personally created or possessed (has a personal right in).

Despite attaching hundreds of unnecessary pages of documents,[7] the NRA has failed to rebut Movants' showing that the subpoena to ACSF is overbroad, irrelevant, and harassing by seeking confidential, proprietary documents from a business relationship that ended more than ten years ago and that has no relevance to any facts in the underlying litigation in Texas. Notably, the NRA relies on alleged information from third parties in support of its subpoena and Response while refusing to actually disclose that information or produce the alleged documents.[8]

---

[4] *Sines v. Kessler*, 2018 U.S. Dist. LEXIS 133124, at *7 (W.D. Va. Apr. 20, 2018) (emphasis in original) (internal quotations omitted).
[5] *See id.* at *8 (finding challenging party had a personal right in the information requested by subpoena and, therefore, that party had standing to quash).
[6] *Id.*
[7] To illustrate, the NRA attached emails with subpoenaed third parties for the proposition that the ACSF subpoena is not problematic because those third parties willingly conferred with the NRA. Most of those subpoenas are not at issue before this Court, and several are subject to pending motions to quash in three other jurisdictions—with three new subpoenas served as of February 24, 2020 that will be subject to additional motions to quash in at least one *additional* jurisdiction. The Western District of Oklahoma has transferred one such motion to quash to the Northern District of Texas. Moreover, the NRA only just disclosed to Movants in support of its Response that any third party produced any documents.
[8] *See* ECF 3 at 6 ("Factual Background") (claiming to have learned about AMc's "fraud" for which the subpoena is required based on "recently unearthed text messages and emails").

The NRA spends much of its Response addressing AMc's work for other clients allegedly similar to the work it performed on NRATV and arguing that AMc opened itself up to this reputational discovery by alleging defamation.[9] The NRA and its lead counsel defamed AMc by accusing it of an extortion coup (in internal NRA communications and in the national press). AMc's reputation for not being extortionists has no relation to NRATV, its billing, or its work for other clients. The NRA has failed to show otherwise.

As to overbreadth, the NRA requested ACSF documents covering certain subject matters, which scope it then expanded by asking for documents *relating, concerning, and referring to* those subjects, *i.e.*, what in reality amounts to any document ever created bearing on those subjects—all documents created by or relating to AMc's services to ACSF. The NRA has not shown how these requests are "narrowly tailored" as represented. As the NRA's choice case explained, a court may find undue burden from a "facially overbroad" subpoena, as here, requiring ACSF to reach back more than ten years for documents wholly unrelated to this present dispute.[10]

| No. | Substance of Request | Overbreadth |
|---|---|---|
| 1 | Documents that *relate to* the scope of work and/or services provided to You by AMc… | Documents that "relate to" AMc's scope of work and/or services provided includes **all** documents ever created for ACSF because all such documents *relate to* AMc's services for ACSF |
| 2 | Documents *concerning* the Digital Media programming | Documents "concerning" the programming and content or platform includes **all** documents ever created for the "Digital Media." |

---

[9] ECF 3 at 13.
[10] *See Wiwa v. Royal Dutch Shell Petroleum, Co.*, 392 F.3d 812, 818 (5th Cir. 2004). *See also e.g.*, *Singletary v. Sterling Transp. Co.*, 289 F.R.D. 237, 241 (E.D. Va. 2012) ("As such, the Court may quash a subpoena duces tecum as overbroad if it does not limit the documents requested to those containing subject matter relevant to the underlying action. … Likewise, Rule 45(c)(3) requires the Court to quash a subpoena that 'subjects a person to an undue burden.' … This undue burden category encompasses situations where the subpoena seeks information irrelevant to the case. Moreover, a subpoena imposes an undue burden on a party when it is overbroad." The court ultimately ruled that he subpoena at issue was "overbroad and not tailored to a particular purpose."); *Schaaf v. Smithkline Beecham Corp.*, 233 F.R.D. 451, 455 (E.D. N.C.) ("On its face, the subpoena seeks every GSK document in Culter's possession created or used within the last ten years," which "stands as a paradigmatic example of a facially overbroad subpoena. … The subpoena is therefore quashed for being facially overbroad and unduly burdensome." The *Schaaf* court also took issue with the subpoena improperly seeking documents like here, where the NRA can request the documents from AMc and proceed through the normal discovery process rather than subjecting AMc, its clients, and unrelated third parties to this satellite litigation.).

| | | |
|---|---|---|
| | and content or platform that AMc provided to You… | |
| 3 | Documents *concerning* forecasts, predictions, or estimates… | Documents "concerning" these topics include **all** documents that pre- and post-date such forecasts, predictions, or estimates, including the underlying work upon which those forecasts are based. |
| 4 | Documents *concerning* the actual performance or success of the Digital Media content and platform… | Documents "concerning" the performance of the entire content and platform includes **all** documents underlying the work upon which the performance/success are based. |
| 6 | Documents that *relate to* the amount of money spent by You on the Digital Media content and platform. | Documents that "relate to" the money spent necessarily includes **all** documents underlying the money spent, *i.e.*, all the documents relating to the services performed—as opposed to documents that reflect the amount of money spent, *i.e.*, invoices already requested in Request No. 7. |
| 8 | Documents reflecting *any concerns* about or requests to AMc for information on CleanSkies.tv or Your Digital Media content and platform… | Documents that reflect "any concern" would include information unrelated to this dispute, even to the NRA's attenuated argument for the subpoena—*e.g.*, the "concern" about when a new segment will air on CleanSkies.tv or the "concern" about whether the platform looks good on mobile as opposed to desktop format, neither of which have any relation to the NRA's claims for fraudulent billing and viewership analytics |
| 9 | Documents and communications, prepared by You, AMc, or Mercury, that *refer or relate to* the following projects: CleanSkies.tv. | Documents that "refer or relate to" CleanSkies.tv includes **all** documents that in any way mention the project, including all documents from inception to cessation, which is grossly overbroad for any purpose in the litigation. |

Moreover, because ACSF and AMc terminated their relationship in 2008, there is no reasonable relevance of such documents to this dispute today, *more than ten years later* (and nearly ten years before the creation of NRATV). Although the NRA argues the subpoena can be modified to a relevant timeframe, it failed to argue *at all* how documents more than ten years old (any such documents were *last* created in 2008) are relevant to the livestream platform of NRATV, let alone how to limit the subpoena.[11] Just because the NRA and ACSF agreed to limit the universe of

---

[11] In the case the NRA relies upon for the contention that this Court may modify the subpoena, (1) the Court used the party's own temporal limitation for the modification, and (2) the Court modified the subpoena to avoid delay because it was unable to determine the basis for the lower court's ruling in quashing the subpoena and whether there was error, not just because it thought the subpoena was worthy of modification. *See Wiwa*, 392 F.3d at 821 & n.45.

documents from all ACSF documents to maybe just those concerning AMc does not mean that the universe that preceded the dispute by ten years is relevant to the dispute. Additionally, even the NRA describes the ACSF work as concerning the energy industry as opposed to the NRA's gun-rights work.[12] That means any viewership analytics will necessarily differ as the audiences (*e.g.*, environmentalists vs. rifle-owners), and responses therefrom, were vastly different—not to mention *when* those audiences were responding and the status of the media technology deployed.



Also, just because ACSF has conferred with the NRA does not obviate the need for the Motion because *AMc* is the party with the competitive interest to protect in these lawsuits. The NRA has not yet engaged in full discovery with AMc to determine whether it must resort to third-party discovery.[13]

Additionally troublesome is the NRA's reliance on its own allegations and "beliefs" rather than any supporting evidence. When claiming "no one watched NRATV's live broadcasting feed,"

---

[12] ECF 3 at 14 ("Clean Skies, an energy-industry advocacy foundation…").
[13] *See Effective Exploration, LLC v. Pa. Land Holdings Co., LLC*, No. 1:15-mc-00014, 2015 U.S. Dist. LEXIS 72283, at *7 (W.D. Va. Jun. 4, 2015) ("Rule 45 allows the court to quash or modify a third-party subpoena where it seeks confidential commercial information, such as is the case here. Also as stated above, Rule 45 permits a court to order the production of such confidential commercial information, under specific conditions, if the serving party 'shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship…' Effective has made no such showing here. Furthermore, such a showing likely would be difficult in light of Effective's concession to the court that it has made no attempt to gather this information from the producer of the coal from these mines," *i.e.*, the party with the interest to be protected and with the knowledge of all the underlying facts.).

the NRA cites to its own First Amended Complaint.[14] The NRA also argued that it "believes that many, if not all, of the prior digital media campaigns that AMc used to induce the NRA to invest in the creation of NRATV were failures."[15] But subjective belief is not the proper standard for determining whether the NRA *first* had a good faith basis in law and fact for asserting a claim to warrant a third party subpoena. We can believe pigs fly, but that does not permit us to subpoena the farmer and all his co-op members for all information about their pigs.

Case in point, the NRA says in its Response and Complaint "many, if not all" of the prior AMc clients had failed media campaigns without ever once saying which clients or providing any support.[16] The NRA also alleges in its Response and Complaint that, "[j]ust like NRATV, those digital media campaigns were shut down because of their general ineffectiveness…."[17] But, again, the NRA never once mentions who "those" "failed" clients are. The reason? Because this is a fishing expedition designed to harass AMc's former and current clients. That improper motive is exposed when considering (1) the NRA subpoenaed third parties who were *never* AMc clients—demonstrating the NRA does not even know who the clients are, let alone that their AMc media campaigns were unsuccessful; and (2) the NRA allegedly wants information about "failed" campaigns that were "shut down," yet it subpoenaed current clients. Typically, this ancillary discovery history (in addition to the discovery abuses in the four lawsuits the NRA has lodged against AMc) is irrelevant, but here it is necessary to understand the NRA's gamesmanship.

Further, the NRA misrepresents to this Court the parties' understanding, agreement, and business practice concerning what analytics would be (and were) provided. In fact, at no point in this litigation, in the three lawsuits the NRA lodged against AMc in Virginia, or in either discovery

---

[14] ECF 3 at 7.
[15] *Id.* at 12.
[16] *Id.*
[17] *Id.*

process has it ever defined "unique" viewership or indicated how the agreed-upon numbers AMc provided (for years) of completed, engaged, and total views were insufficient. What the NRA purports to "reasonably" request here does not exist because the NRA never requested such metrics at the time and, indeed, such measurement was impossible: one cannot count whether person A is watching NRATV content across multiple platforms (website, Facebook, etc.) and devices.

The NRA then cites to a deposition from a former ACSF employee to propose that his testimony is proof AMc charged "steep costs that were not recoverable" and refused "to respond to questions and requests for information on budgets and operations."[18] Some issues: (1) as that employee testified, he had no degree or prior experience with accounting for proper budgeting practices; and (2) the ACSF creator and its Board repeatedly approved the AMc budgets and work performed, as the employee further admitted during his deposition. The employee also testified that all of the bills issued by AMc were in fact paid by ACSF.

The NRA also relies on offensive use of the attorney-client privilege in support of its arguments, which is the subject of pending disputes before the Northern District of Texas. Namely, the NRA accuses AMc of "obstructing its investigation" by "attempt[ing] extortion and an unsuccessful coup," but (1) the evidence baldly demonstrates the opposite, and (2) the extortion idea was planted by the NRA's counsel, hence the reason the NRA continues to assert privilege over the *underlying fact* (read: non-privileged) of who first claimed attempted extortion. Such an inappropriate sword-and-shield use of the attorney-client privilege is improper as a basis for granting the NRA its overreaching subpoena.

Beyond these reasons, the NRA also has an improper motive for seeking the documents. On the one hand, the NRA concedes, in different verbiage, that it wants to use this information to

---

[18] ECF 3 at 14.

show AMc acted in conformity with prior bad acts. On the other hand, the NRA's lead counsel is using these subpoenas to circumvent the Virginia protective order it seeks to unwind. That order prohibits the NRA's lead counsel from accessing, reviewing, or using AMc's Highly Confidential information. But if the NRA could obtain those documents in the federal case in Texas through a third party *first*, AMc's only opportunity to designate the information Highly Confidential would be *after* the NRA already has an opportunity to review and use the documents. And any potential claw-back remedy requires unfounded reliance on the NRA and its counsel complying therewith. The fact that AMc just learned through the NRA's Response that some third parties have produced documents proves this risk to be real and imminent.

As set forth by *Wiwa*, the ACSF subpoena (1) seeks information not relevant to the dispute in the lawsuit, which (2) exposes the lack of the NRA's need for such documents; (3) the subpoena is facially and practically overbroad, exacerbated by (4) an attenuated time period extending *beyond* 10 years; (5) the subpoena lacks particularity when it seeks *all* documents between AMc and ACSF relating to AMc's services; and (6) the overbreadth alone demonstrates undue burden, which all factors together further emphasize.[19]

## CONCLUSION

For the foregoing reasons, Movants respectfully request this Court grant their Motion; quash the subpoena issued to ACSF or transfer the Motion to the Northern District of Texas; and grant Movants any further relief, at law or in equity, to which they may be justly entitled.

---

[19] 392 F.3d at 818.

Dated: February 27, 2020.

          Respectfully submitted,

          */s/ David H. Dickieson*
          **David H. Dickieson (VSB No. 31768)**
          **SCHERTLER & ONORATO, LLP**
          901 New York Avenue, NW
          Suite 500
          Washington, D.C. 20001
          Ph: 202-628-4199/Fax: 202-628-4177
          ddickieson@schertlerlaw.com

          **ATTORNEY FOR MOVANTS ACKERMAN MCQUEEN, INC., MERCURY GROUP, INC., HENRY MARTIN, JESSE GREENBERG, WILLIAM WINKLER, AND MELANIE MONTGOMERY**

## CERTIFICATE OF SERVICE

      I hereby certify that on February 27, 2020, I filed the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Virginia. I hereby certify that I am affecting service of the document on counsel for the NRA the issuing court in the Northern District of Texas, Dallas Division.

          */s/ David H. Dickieson*
          DAVID H. DICKIESON